**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**TANZA HADD,**

       **Plaintiff,**

       **v.**                    **Case No. 2:17-cv-02533-HLT**

**AETNA LIFE INSURANCE COMPANY,**

       **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Tanza Hadd brings this action pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., to recover benefits Plaintiff claims are due under the terms of a long-term disability ("LTD") plan. Plaintiff was a participant in her employer's LTD plan, which was insured by Defendant Aetna Life Insurance Company. Plaintiff filed a claim for LTD benefits that Defendant denied. She now seeks review of that decision pursuant to 29 U.S.C. § 1132(a)(1)(B). Doc. 1. Plaintiff also filed an amended complaint purporting to seek statutory penalties under 29 U.S.C. § 1132(c)(1)(B), alleging Defendant failed to provide plan documents as required by ERISA. Doc. 36.

Defendant now moves for summary judgment on both of Plaintiff's claims. Doc. 44. Plaintiff opposes that motion and also moves to submit certain exhibits in stanter that were omitted from her opposition brief. Doc. 53. As an initial matter, the Court grants Plaintiff's request to file her belatedly-submitted exhibits in stanter. With respect to Defendant's request for summary judgment, because the Court finds that the denial of benefits was not arbitrary or capricious, the Court grants summary judgment in Defendant's favor on Plaintiff's § 1132(a)(1)(B) claim. The Court likewise grants Defendant's request for summary judgment on Plaintiff's § 1132(c)(1)(B)

penalty claim, as Plaintiff did not move for leave to amend her complaint to assert that claim as required under the Federal Rules, and, regardless, that claim is not viable against Defendant.

## I.      BACKGROUND

### A.      Consideration of Plaintiff's Additional Exhibits

Before reciting the pertinent facts and addressing the merits of the parties' arguments, the Court first addresses Plaintiff's request to file certain exhibits to her summary judgment opposition brief in stanter. Doc. 53. The exhibits Plaintiff moves to submit in stanter include: (1) the curriculum vitae ("CV") of Dr. Timothy Craven (Doc. 53-1 at 1-4); (2) a compilation of documents from the claim file (which the parties acknowledge is already part of the administrative record before the Court in this case) (Doc. 53-1 at 5-85); and (3) news releases from Defendant (which Plaintiff characterizes as a "stock statement") regarding Defendant's acquisition of Coventry Health Care, Inc. ("Coventry") (Doc. 53-1 at 86-99).

In cases involving review of a denial of ERISA benefits, the Court's review is normally "limited to the administrative record," i.e., the materials compiled in the course of making the benefits decision. *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009). The party seeking to supplement the record—here, Plaintiff—bears the burden of showing the propriety of doing so. *McNeal v. Frontier AG, Inc.*, 998 F. Supp. 2d 1037, 1041 (D. Kan. 2014). Although "it is the unusual case in which the district court should allow supplementation of the record," supplementation may be warranted when there is evidence outside the administrative record regarding a conflict-of-interest issue or when there is evidence that a claimant could not have presented in the administrative process. *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1203 (10th Cir. 2002); *McNeal*, 998 F. Supp. 2d at 1041.

For the following reasons, the Court grants Plaintiff's motion to file in stanter. The parties do not dispute that the documents comprising Plaintiff's Exhibit 2 are part of the administrative record and were already submitted to the Court; therefore, consideration of Exhibit 2, although duplicative, is within the scope of the Court's review. And the Court finds that Plaintiff's Exhibits 1 and 3 are related to Plaintiff's arguments on the conflict-of-interest issue (*see infra* Part II.A.1.b), which the Tenth Circuit recognizes may warrant admission of extra-record evidence. *See McNeal*, 998 F. Supp. 2d at 1041. Exhibit 1 is Dr. Craven's CV, which Plaintiff uses to support her argument that Dr. Craven—the occupational medicine specialist who performed the independent medical review in connection with Defendant's initial benefits determination—"has been working for and paid by [Defendant] since 2007." Doc. 50 at 55. And Exhibit 3 consists of news releases that Plaintiff argues "establish[] that [Defendant] purchased Coventry [Health Care, Inc.]" Doc. 53 at 1. This exhibit is relevant to Plaintiff's argument that Kristen Hamilton—a vocational field case manager from Coventry who performed a vocational assessment of Plaintiff in connection with the benefits determination—was not actually "independent." Doc. 50 at 55. Finding these documents pertinent to its conflict-of-interest analysis, the Court therefore considers Exhibits 1 and 3—but only as they pertain to that issue.[1]

---

[1] The Court acknowledges that Plaintiff filed the exhibits late. But a district court may, in its discretion, consider an untimely filing where the failure to timely act was the result of excusable neglect. *See* FED. R. CIV. P. 6(b); *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1288 n.14 (10th Cir. 2002). "In determining whether the excusable neglect standard is met, courts should consider all relevant circumstances, including (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." *Secure Techs. Int'l v. Block Spam Now, LLC*, 2004 WL 2005787, at *2 (D. Kan. 2004). The Court finds that consideration of these factors—including the minimal length of delay by Plaintiff in submitting the exhibits (four days after filing her opposition), the lack of any impact on these proceedings occasioned by that delay (the exhibits were filed well before Defendant submitted its reply brief), the reasons provided for the delay (various administrative and personal issues), and the risk of prejudice were the Court to disregard the filing—support a finding of excusable neglect justifying consideration of the untimely filing.

## B. Administrative Record Factual Findings[2]

### 1. Long-Term Disability Plan

United Parcel Service of America, Inc. ("UPS") previously employed Plaintiff as an Operations Supervisor/Manager (also known as a "Hub Supervisor"). UPS classified this position as a "heavy" occupation, and the position involved moving packages of up to 150 pounds and working in an environment with dust, dirt, and variable temperatures.

As a benefit of her employment with UPS, Plaintiff participated in UPS's employee welfare benefit plan ("Plan"), which was funded, at least in part, by a group insurance policy ("Policy") issued by Defendant to UPS. The Policy offers LTD coverage, which provides a source of income for employees who become disabled and unable to work due to an illness, injury, or disabling pregnancy-related condition. To determine whether an employee is "disabled" for purposes of receiving LTD benefits, the Policy contains a "test of disability." The test—i.e., the criteria an employee must meet to show that he or she is disabled—differs based upon the length of time benefits have been paid. From the date of onset of disability until monthly benefits are payable for 24 months, an employee meets the test of disability on any day that he or she: (1) "cannot perform the material duties of [their] own occupation solely because of an illness, injury or disabling pregnancy-related condition"; and (2) [their] earnings are 100% or less of [their] adjusted predisability earnings." But after the first 24 months of the disability that monthly benefits are payable, an employee meets the test of disability on any day that he or she is "unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition." In their briefing, the parties refer to the first part of the test as the "Own Occupation"

[2] The following facts are based exclusively on the administrative record submitted by the parties and the in stanter exhibits (*see supra* Part I.A), and, with respect to the administrative record, the Court considers the entire administrative record in its analysis and not just those particular facts that the parties reference in their briefs.

test and the latter part as the "Any Occupation" test, and the Court accordingly adopts this terminology here.

The Policy defines the term "own occupation" (as used in the Own Occupation test) in pertinent part as the occupation the employee is "routinely performing when [their] period of disability begins." The term "reasonable occupation" (as used in the Any Occupation test), meanwhile, is defined as "any gainful activity" (1) "[f]or which [an employee is], or may reasonably become, fitted by education, training, or experience"; and (2) [w]hich results in, or can be expected to result in, an income of more than 60% of [their] adjusted predisability earnings."

Disability benefits under the Policy end on the date an employee fails to provide proof that he or she meets the test of disability. The Policy grants Defendant "discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits" and to "construe any disputed or doubtful terms" of the Policy.

### 2. Plaintiff's Long-Term Disability Claim

In April 2013, Plaintiff stopped coming to work at UPS due to Churg-Strauss Syndrome (an autoimmune disorder marked by blood vessel inflammation) and associated symptoms, which included asthma and breathing difficulties. Plaintiff was subsequently approved for LTD benefits on October 7, 2013 under the Policy's Own Occupation test. Defendant advised Plaintiff that, if her disability should extend to October 7, 2015, pursuant to the Policy Defendant would require reevaluation of her claim. During the initial 24-month period, Defendant periodically reviewed Plaintiff's medical information. On May 30, 2014, Dr. Danielle Perry (family medicine doctor) noted that Plaintiff should be restricted from being "in any environment which may contribute to lung symptoms including dust, chemicals, [and] fumes," but, with those restrictions, Plaintiff had the ability to perform "sedentary work activity."

As Plaintiff neared the receipt of 24 months of benefits, Defendant began the process of reevaluating her claim under the Any Occupation test. On February 9, 2015, RN Berlyne Cesar (clinical consulting nurse) performed a review of Plaintiff's medical information to assess her status. Nurse Cesar noted that Plaintiff underwent nasal surgery in October 2014, after which she did not report any asthma exacerbations, shortness of breath, fatigue, or breathing difficulties. Nurse Cesar also noted that, although Plaintiff was expected to follow up with an orthopedic specialist to address her hip complaints, it did not appear Plaintiff had done so. Nurse Cesar spoke with Plaintiff on April 29, 2015, at which time Plaintiff advised Nurse Cesar that she was treating with a rheumatologist (Dr. Julian Magadan) and a family practitioner (Dr. Perry). Plaintiff also confirmed that she was not treating with an orthopedic specialist for her hips. Nurse Cesar reached out to Dr. Magadan on June 25, 2015. Based on their conversation, Nurse Cesar determined that, due to Plaintiff's uncontrolled breathing issues, her functionality was "unable to be concluded" and recommended following up after additional medical information was received.

In assessing Plaintiff's medical condition and status, Defendant sought an independent medical review, which was performed by Dr. Craven, who is board certified in occupational medicine. Dr. Craven reviewed Plaintiff's medical records and spoke with her treating physicians, Dr. Perry and Dr. Magadan, on June 29, 2015 and July 1, 2015, respectively. When Dr. Craven spoke to Dr. Perry, Dr. Perry confirmed that Plaintiff could perform sedentary work provided there was no exposure to dust or chemicals. Dr. Magadan similarly explained that Plaintiff would have some limitations from her Churg-Strauss syndrome and some limitations in her ability to engage in prolonged standing and walking. Based on his review and discussions with Drs. Perry and Magadan, Dr. Craven therefore concluded that "[p]ermanent total disability is not supported" and that, although Plaintiff "has limitations of her general level of functioning," she "should be able to

perform sedentary physical level work." Dr. Craven certified his independence by affirming that he had no significant relationship with Plaintiff, her treating providers, or her treatment facilities, and no incentive (financial or otherwise) to offer an opinion other than his "honest professional assessment of the information provided for review."

On July 15, 2015, Ms. Hamilton—a vocational field case manager from Coventry—performed a vocational assessment and transferrable skills analysis and labor market analysis ("TSA") to determine if there were appropriate occupations for Plaintiff in light of her functional capacity, education and work experience, wage requirement, and geographic location. Following her review, Ms. Hamilton identified several occupations that matched Plaintiff's abilities and requirements.

Following its receipt of Dr. Craven's report, Defendant sought additional clarification regarding Plaintiff's bilateral upper extremity limitations and their impact, if any, on her capacity for sedentary employment. On August 10, 2015, Defendant spoke with Plaintiff to obtain an update on her condition. Defendant also reached out to Dr. Craven for additional information, which he provided on August 13, 2015, stating in an addendum to his report that "[i]t is not clear at this time . . . whether [Plaintiff] has an ongoing significant impairment of her upper extremities."

In September 2015, while its review was ongoing, Defendant received notice of a June 25, 2015 decision awarding Plaintiff social security disability ("SSDI") benefits. Defendant received a copy of the SSDI file and the SSDI decision itself. In the SSDI decision, the administrative law judge concluded that—based on Plaintiff's inability to perform her "past relevant work" and factors such as her advanced age—Plaintiff qualified for SSDI benefits despite possessing the capacity for "the full range of sedentary work."

After reviewing the SSDI file, Dr. Craven's report, and other information in the claim file, Defendant ultimately determined that Plaintiff possessed the functional capacity for sedentary employment (provided she could avoid environmental irritants). On September 28, 2015, Defendant sent a letter to Plaintiff notifying her that, because she had failed to prove a disability under the Policy's Any Occupation test, it would discontinue benefits effective October 7, 2015. The letter outlined the applicable Policy provisions, including the disability definitions, and also explained Defendant's rationale for the decision.

### 3. Plaintiff's Appeal

On February 12, 2016, Plaintiff appealed Defendant's decision. With her appeal, Plaintiff included progress notes and a letter from Dr. Magadan. Dr. Magadan's letter, dated February 8, 2016, stated Plaintiff was "totally disabled from performing any reasonable occupation for which she is qualified by education, training, or experience." The letter did not provide specific restrictions and limitations, stating only that Dr. Magadan "[did] not feel at this time that [Plaintiff] could take part in either part-time or full-time" work.

Defendant assigned Plaintiff's appeal to an appeal specialist, Kelly Smith, who was not involved in the initial benefits determination. And a new independent peer review was performed by Dr. Evelyn Balogun, who, like Dr. Craven, is board certified in occupational medicine. In connection with her review, Dr. Balogun made numerous attempts to reach Dr. Perry and Dr. Magadan to discuss Plaintiff's functionality, care, and treatment, but neither returned her calls. Dr. Balogun also reached out to Plaintiff's pulmonologist, Dr. Vance Burns, but his office advised her that he only saw Plaintiff once, in 2013.

Dr. Balogun also considered Plaintiff's most recent hip x-ray, which was ordered by Dr. Magadan and performed on November 9, 2015 by Dr. Brian Everist. In contrast to a CT scan

performed in December 2014, the 2015 x-ray revealed that "[c]hanges of avascular necrosis are not radiographically evident" in the left or right hips. Dr. Everist's notes indicate he compared the 2014 CT scan and the 2015 x-ray in formulating this impression. Dr. Balogun similarly concluded that the 2015 x-ray "showed no radiographic evidence of avascular necrosis."

Dr. Balogun ultimately found that the evidence supported functional capacity "at a sedentary physical demand level" that did not include working in dusty environments. Dr. Balogun also found "no indication for limiting the use of [Plaintiff's] upper extremity for fingering, handling, feeling, or reaching" and further noted that "[t]he records do not establish that [Plaintiff] is limited as a result of any condition which would limit the use of her extremities for these tasks." Defendant sent copies of Dr. Balogun's report to Drs. Perry, Magadan, and Burns for their review and comment. The physicians were asked to contact Defendant if they disagreed with Dr. Balogun's findings. Only Dr. Magadan responded, stating that sedentary employment would be "difficult" given the symptoms and complications arising from Plaintiff's bilateral avascular necrosis of the hips and Churg-Strauss syndrome. Dr. Balogun subsequently addressed the issue of Plaintiff's functionality with Dr. Magadan in a phone call on June 16, 2016. During the call, Dr. Magadan asserted that avascular necrosis of the hips impaired Plaintiff's functionality but conceded that Plaintiff's most recent examination was "pretty much within normal limits." Dr. Magadan also admitted that he had not tested Plaintiff's range of motion and did not find swelling or tenderness at any joint level, and further opined that Plaintiff's Churg-Strauss disease was "stable."

On June 21, 2016, following her discussion with Dr. Magadan and her review of the file, Dr. Balogun stated that her "position remains unchanged." Dr. Balogun concluded that Plaintiff did not have "any appreciable disease" and, therefore, there was "no medical basis for the

recommended restrictions" suggested by Dr. Magadan. Dr. Balogun outlined a number of restrictions and limitations for Plaintiff, which included, among other things, no work in dusty environments or other environments that could increase her exposure to allergens or asthma triggers. Dr. Balogun specifically noted that there was "no restriction on use of upper extremity for fingering, handling, feeling, [or] reaching" and "no restriction on sitting." Dr. Balogun certified that she was providing her opinions based upon a "reasonable degree of clinical certainty" and, like Dr. Craven, that she had no significant relationship with Plaintiff, her treating doctors, or her treating facilities, and that she had no incentive to promote services associated with the claim.

In connection with Plaintiff's appeal, Jan Plummer—a vocational rehabilitation specialist—also assessed whether the occupations identified by Ms. Hamilton in her TSA remained viable options in light of the updated restrictions and limitations recommended by Dr. Balogun. Ms. Plummer's review confirmed that the occupations remained within Plaintiff's abilities.

On June 29, 2016, Ms. Smith issued her appeal decision upholding the claim determination. The decision letter outlined the information considered on appeal, including the updated medical records, communications with Dr. Magadan, medical reviews, updated TSA, and the SSDI file. Plaintiff was advised she could submit a second appeal if she disagreed with the decision.

### 4.    Plaintiff's Second Appeal

Plaintiff submitted her second appeal on August 29, 2016. As grounds for her second appeal, Plaintiff argued she suffered from a "myriad of severe medical conditions" impacting her ability to work. Plaintiff also argued that Dr. Balogun erred in relying on the 2015 x-ray rather than the 2014 CT scan.

With her appeal, Plaintiff submitted new records from Dr. Magadan. These records showed a follow up office visit on July 29, 2016, during which Dr. Magadan concluded Plaintiff's physical

examination was normal with the exception of some edema and "[b]ilateral boggy nasal turbinates." Dr. Magadan also noted that a joint exam showed "no swelling, tenderness, or limitation" in Plaintiff's hips.

On September 28, 2016, Plaintiff provided Defendant with additional medical records, including a statement from Dr. Magadan outlining his opinions regarding Plaintiff's functionality. In this statement, Dr. Magadan noted that Plaintiff had reduced range of motion in her joints, reduced grip strength, muscle weakness and spasm, tenderness, reflex changes, abnormal gait, swelling, and trigger points. Dr. Magadan also stated that Plaintiff's medications caused issues including pain, fatigue, lack of concentration, and the "need to lay down and nap," among others. Dr. Magadan further noted that Plaintiff's "total body is affected from upper and lower extremities," requiring that Plaintiff cannot sit for more than 15 minutes for a total of two hours during an eight-hour day.

Following receipt of the second appeal, Ms. Smith provided the updated medical information to Dr. Balogun for her review. Dr. Balogun completed her review on November 8, 2016, essentially reaffirming her earlier findings and responding to the additional medical information provided by Plaintiff. Dr. Balogun concluded that Plaintiff was "capable of performing the tasks/activities as of 10/7/2015 within the restrictions outlined in my 7/21/2016 report." On November 10, 2016, Ms. Smith responded to Plaintiff's second appeal, again upholding the initial claim decision and outlining Dr. Balogun's findings. This cause of action followed.

### C.      Facts Related to Plaintiff's Amended Complaint

Plaintiff's original complaint in this action was filed on September 14, 2017, asserting a single claim under § 1132(a)(1)(B) of ERISA for review of Defendant's decision denying her

benefits. Doc. 1. Over one year later, on September 24, 2018, Plaintiff filed an amended complaint, which—in addition to the original § 1132(a)(1)(B) claim—purports to add a claim for statutory penalties under § 1132(c)(1)(B). Doc. 36. Plaintiff did not seek leave of Court before submitting this amended complaint, nor did she obtain Defendant's consent before filing.

Plaintiff's statutory penalty claim pertains to a request for documents submitted to Defendant on November 29, 2016. The request, sent by Plaintiff's counsel, asked for "a copy of all the documents [Defendant has] regarding this matter, including all the medical records, reports, and notes relied upon by [Defendant] or its agents in denying [Plaintiff's] claim." The request also sought "a copy of the plan brochure and also the summary plan description." Defendant responded on December 7, 2016, enclosing a copy of Plaintiff's claim file. In its response, Defendant advised Plaintiff that, given its role as "claim administrator," the plan documents it was providing were only those used in the administration of the claim. Defendant therefore further advised Plaintiff that, for a complete copy of all plan documentation, she would need to contact the "plan administrator" directly—here, UPS. Defendant accordingly provided Plaintiff with UPS's address. In her statutory penalty claim, Plaintiff ostensibly argues Defendant violated § 1132(c)(1)(B) by providing only a partial portion of the file, rather than the entire file, with its response. Doc. 50 at 53.

## II.    ANALYSIS

In this action, as set forth above, Plaintiff purports to allege two distinct claims under ERISA: (1) a claim for review of Defendant's decision under 29 U.S.C. § 1132(a)(1)(B); and (2) a claim alleging that Defendant violated 29 U.S.C. § 1132(c)(1)(B), which gives courts discretion to penalize administrators for failing to comply with requests for certain documents ERISA requires

them to provide participants. Docs. 1, 36. Defendant now moves for summary judgment. Doc. 44. The Court addresses each claim in turn.

### A.    Claim Under 29 U.S.C. § 1132(a)(1)(B)

Section 1132(a)(1)(B) of ERISA permits a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" by way of a civil action. 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has recognized that this section "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court"—which is what Plaintiff does here. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The Court begins by addressing the standard governing its review of the benefits denial and then proceeds to its substantive review of that denial.

#### 1.    Standard

##### a.    Review of Benefits Denial

As courts in this District have recognized, "summary judgment standards are not totally suited to the Court's review of the administrative record in an ERISA action." *Brende v. Reliance Standard Life Ins. Co.*, 2017 WL 4222982, at *1 (D. Kan. 2017); *see also McNeal*, 998 F. Supp. 2d at 1040-41. In its motion, Defendant ultimately does not ask the Court to determine whether material issues of fact remain for trial; rather, Defendant seeks review of the administrative record to determine whether Plaintiff's claim for disability benefits was reasonably denied. Docs. 44, 45. The Court's role, therefore, is "to act 'as an appellate court and evaluate[] the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record.'" *McNeal*, 998 F. Supp. 2d at 1040-41 (quoting *Panther v. Synthes (U.S.A.)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005)).

Denial of ERISA benefits is reviewed under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotations omitted). Where a plan confers such discretionary authority, a deferential standard of review is employed, asking only whether the denial was "arbitrary and capricious." *Id.* Under the arbitrary-and-capricious standard, "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." *Id.* (internal quotations omitted). The decision will be upheld "so long as it is predicated on a reasoned basis" and "there is no requirement that the basis relied upon be the only logical one or even the superlative one." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). Rather, courts ask only "whether the administrator's decision resides somewhere on a continuum of reasonableness—even if on the low end." *Id.* (internal quotations omitted). Accordingly, as recognized by the Tenth Circuit, the arbitrary-and-capricious standard is a "difficult one for a claimant to overcome." *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002). "Lack of substantial evidence, mistake of law and bad faith are considered indications of arbitrary and capricious decisions." *McNeal*, 998 F. Supp. 2d at 1042.

As discussed in Part I.A, above, in cases seeking review of a denial of ERISA benefits, the Court's review is limited to the administrative record. In reviewing the administrative record to determine whether Defendant's decision to deny benefits was arbitrary and capricious, the Court should consider whether "substantial evidence" supported the decision. *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009). Whether evidence is "substantial" is "evaluated against the backdrop of the administrative record as a whole." *Adamson*, 455 F.3d at 1212.

### b. Conflict-of-Interest Analysis

The parties do not dispute that the Plan grants Defendant discretion to determine eligibility for benefits and to construe the Plan's terms, and, accordingly, the arbitrary-and-capricious standard applies to the benefits determination in this case. But the Supreme Court has held that, where an entity is responsible for making benefits determinations and is <u>also</u> the party responsible for paying claims (as is the case here), an inherent conflict of interest exists. *Glenn*, 554 U.S. at 114. Contrary to Plaintiff's assertion,[3] however, the presence of such a conflict does <u>not</u> alter the standard of review; rather, courts consider the conflict as a factor in determining whether the fiduciary has abused its discretion in denying benefits. *Id.* at 115. The significance of the factor depends on the circumstances of the particular case. *Id.* at 117. The conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision," such as in cases "where an insurance company administrator has a history of biased claims administration." *Id.* But the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

Following its review, the Court finds the circumstances of the case do not suggest that Defendant's inherent conflict of interest impacted the benefits determination. Defendant contends its took "numerous steps" during its review process to promote accuracy, including: (1) conducting

---

[3]     Plaintiff relies on an Eighth Circuit decision, *Woo v. Deluxe Corp.*, 144 F.3d 1157 (8th Cir. 1998), in support of her argument that—given Defendant's dual role as decisionmaker and payor—a less deferential standard should govern the Court's review of Defendant's claims decision. However, the Supreme Court's decision in *Glenn* abrogated *Woo* (and its progeny) to the extent *Woo* allowed a less deferential standard of review based merely on a conflict of interest. *See Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 320 (8th Cir. 2018) (recognizing abrogation of *Woo*).

a voluntary second appeal review of the initial determination; (2) consulting with medical and vocational resources as necessary; and (3) repeatedly engaging with Plaintiff and requesting that she provide information so Defendant could understand her position. Doc. 45 at 20. The Court finds that the evidence supports these contentions. In connection with the initial benefits determination, Defendant obtained an independent medical examination of Plaintiff, which was performed by Dr. Craven. Dr. Craven certified his independence by affirming that he had no significant relationship with Plaintiff, her treating providers, or her treatment facilities, and no incentive (financial or otherwise) to offer an opinion other than his "honest professional assessment of the information provided for review."

After Plaintiff appealed Defendant's initial denial of benefits, the appeal was assigned to an appeal specialist, Ms. Smith, who was not involved in the initial claim determination. And, in connection with Plaintiff's first and second appeals, Defendant obtained a new independent peer review by Dr. Balogun who, like Dr. Craven, certified her independence by stating that she had no significant relationship with Plaintiff, her treating doctors, or her treating facilities, and that she had no incentive to promote services associated with the claim. Defendant also obtained a TSA, which was conducted by Ms. Hamilton (vocational field case manager from Coventry) in connection with the initial determination and was later updated by Ms. Plummer (a vocational rehabilitation specialist) in connection with the first appeal. Further, Defendant spoke with Plaintiff throughout the claims process to obtain updates on her condition and to gather additional information.

Plaintiff ostensibly attacks the integrity of the claim determination on the basis that the individuals and entities involved were not "independent." Specifically, Plaintiff argues: (1) Ms. Hamilton was not "independent" given Defendant's acquisition of Coventry;

(2) Dr. Craven was not "independent" because his CV shows he "has been working for and paid by [Defendant] since 2007"; and (3) Allsup—which Plaintiff claims is "closely related" to Defendant—provided Defendant information related to Plaintiff's SSDI claim. Doc. 50 at 54-55. Plaintiff argues these alleged conflicts prove Defendant "controlled every aspect" of the claims process. *Id.* at 55. The Court disagrees. With respect to Plaintiff's first argument, the news releases regarding Defendant's acquisition of Coventry do not establish anything with respect to the independence of Ms. Hamilton's review. Likewise, as to Plaintiff's second argument, Dr. Craven's CV—which simply lists that, from 2007 to 2017, he served as an "independent consultant" for Defendant performing "claim review for disability claims" (Doc. 53-1 at 3)—does not cast any doubt upon the integrity of Defendant's review. Finally, Plaintiff produces no evidence in support of her vague arguments regarding Defendant's relationship with Allsup. Plaintiff bears the burden to prove a conflict and she has not done so here. *See Wolberg v. AT&T Broadband Pension Plan*, 123 F. App'x 840, 845 (10th Cir. 2005). All Plaintiff presents are speculative and conclusory allegations; she presents no actual evidence showing these alleged conflicts impacted Ms. Hamilton's and Dr. Craven's conclusions regarding Plaintiff. Because the circumstances of the case do not suggest that Defendant's inherent conflict impacted its benefits determination, the conflict will carry limited weight in the Court's analysis.

## 2. Analysis

Taking all of the above into consideration, the Court proceeds to its review of Defendant's benefits decision—i.e., its denial of Plaintiff's claim for LTD benefits under the Policy's Any Occupation test. Defendant determined Plaintiff did not meet the Any Occupation test for disability because she was, at a minimum, able to perform full time sedentary work. Therefore, Defendant

found Plaintiff failed to prove an entitlement to LTD benefits. Plaintiff seeks judicial review of that decision.

Defendant contends it is entitled to summary judgment on Plaintiff's claim for review because every reasonable jury would find that its decision was based on substantial evidence in the administrative record and was reasonable, proper, and not an abuse of discretion. Doc. 45. Plaintiff, meanwhile, alleges three bases for finding that Defendant's decision was arbitrary and capricious: (1) Defendant failed to perform a "full and fair" review of the evidence; (2) the denial of Plaintiff's appeal was "without basis" due to Dr. Balogun's reliance upon the 2015 x-ray, rather than the 2014 CT scan; and (3) Defendant's decision denying Plaintiff's second appeal was arbitrary and capricious. Doc. 50.

The Court first addresses Plaintiff's argument that Defendant failed to perform a "full and fair" review of the evidence as required by ERISA. *Id.* at 38-46. In support of this argument, Plaintiff identifies a number of perceived shortcomings or "procedural irregularities" in Defendant's review. *Id.* First, Plaintiff argues Defendant erred by not consulting an expert in the field of medicine involved in her claim (rheumatology). *Id.* at 39-41. Rather, the review of Plaintiff's claim and subsequent appeals was conducted by Nurse Cesar and by Drs. Craven and Balogun, both of whom specialize in occupational medicine. *Id.* The fact that Defendant did not consult a rheumatologist, however, does not warrant denial. Although ERISA regulations require utilization of peer reviewers that have "appropriate training and experience in the field of medicine involved in the medical judgment" (29 C.F.R. § 2560.503-1(h)(3)(iii)), a claims administrator does not abuse its discretion by selecting a reviewing physician who does not have the <u>exact</u> same specialty as the claimant's treating physician. *See, e.g.*, *Healthcare Am. Plans, Inc. v. Bossemeyer*, 953 F. Supp. 1176, 1191 (D. Kan. 1996); *Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287, 295

(5th Cir. 2017) (rejecting argument that occupational medicine specialists were unqualified to assess lupus due to lack of board certifications in rheumatology and recognizing that an administrator "does not abuse its discretion merely by selecting a reviewing physician who does not have the exact same specialty as the claimant's treating physician").

Second, Plaintiff argues that Defendant failed to assess Plaintiff's complaints of pain. Doc. 50 at 41-43. Specifically, Plaintiff contends that, without an independent evaluation of her complaints (especially as they pertain to the hips) there can be no "full and fair" review. *Id.* at 41. As an initial matter, the Court agrees with Defendant's analysis that Plaintiff's medical records are devoid of any evidence regarding the frequency or intensity of her alleged pain. Rather, Plaintiff's claims regarding her pain are based entirely on Dr. Magadan's reports and, although treating physicians may be "more or less required" to accept a plaintiff's pain complaints as true, that is "by no means required of [the] court." *Niles v. Am. Airlines, Inc.*, 563 F. Supp. 2d 1208, 1218 (D. Kan. 2008). Moreover, Defendant was under no obligation to obtain an independent medical evaluation of Plaintiff and the fact that it did not do so does not constitute an abuse of discretion. *See Winfrey v. Hartford Life & Acc. Ins. Co.*, 127 F. Supp. 3d 1153, 1167 (D. Kan. 2015) (holding that it was not an abuse of discretion to use a file review rather than an independent medical examination). The Court also addresses Plaintiff's argument that Dr. Magadan complained that "those who interviewed him"—presumably Drs. Craven and Balogun—pressured him to "change his opinions" regarding Plaintiff. Doc. 50 at 42. In support of this assertion, Plaintiff cites the "Hadd Affidavit." *Id.* The Court notes that this affidavit is neither attached to the opposition nor included as part of Plaintiff's request to file exhibits in stanter and, regardless, is not part of the administrative record, constitutes inadmissible hearsay, and is after-the-fact evidence not

considered during Defendant's claim review process. The Court therefore disregards this unsupported assertion.

Third, Plaintiff argues that Defendant misconstrues Dr. Perry's and Dr. Magadan's opinions. *Id.* at 43-44. However, the Court finds that Defendant's recitation of their opinions is consistent with the record. And both opinions ultimately support Defendant's conclusion that Plaintiff had the ability to perform sedentary work, provided she had no exposure to dust or other chemicals.

Fourth, and finally, Plaintiff contends Ms. Hamilton did not account for Plaintiff's restrictions, skills, and education in conducting her TSA. *Id.* at 44-46. Ms. Hamilton performed the TSA to determine if there were appropriate occupations for Plaintiff in light of her functional capacity, education and work experience, wage requirements, and geographic location. Following her review, Ms. Hamilton identified several occupations that matched Plaintiff's abilities and requirements. With respect to Plaintiff's argument that the TSA did not account for the restrictions noted by Dr. Magadan, the weight of the evidence suggests that there was no medical basis for Dr. Magadan's recommended restrictions. Plaintiff also argues that the jobs identified in the TSA require education and training that she does not have and that the analysis must "review positions for which she qualifies at this time, not some possible time in the future." *Id.* at 45. But this argument ignores the applicable Policy language, which defines "reasonable occupation" (as used in the Any Occupation test) as "any gainful activity" (1) "[f]or which [an employee is], or may reasonably become, fitted by education, training, or experience"; and (2) [w]hich results in, or can be expected to result in, an income of more than 60% of [their] adjusted predisability earnings." Therefore, to the extent some additional education or training may be required on Plaintiff's part, this is anticipated and permitted by the relevant Policy language.

The Court next addresses Plaintiff's argument that the denial of her appeal was "without basis," which is primarily premised on the fact that Dr. Balogun relied on Plaintiff's 2015 x-ray, rather than her 2014 CT scan, in determining there was no evidence of avascular necrosis in her hips. *Id.* at 46-48. But the Court finds that Dr. Balogun's consideration of Plaintiff's 2015 hip x-ray was not in error. Indeed, Dr. Balogun directly addressed the arguments Plaintiff raises here in connection with the second appeal, noting that "[t]he American College of Radiology . . . considers x-rays of the pelvis and hip as the most appropriate initial imaging study in patients at risk for [avascular necrosis] who present with hip pain." Dr. Balogun further noted that the 2015 x-ray findings are indicative of "possible early stage disease which should not generally be associated with enough pathology to warrant functional restrictions" or "account for the reported inability to ambulate or perform sedentary type tasks." Dr. Balogun similarly explained that the 2014 CT scan "also did not show evidence of severe pathology such as articular collapse or the presence of loose bodies." Ultimately, Dr. Balogun concluded it was "possible for [Plaintiff's] symptoms to improve" with early diagnosis and treatment. As Defendant notes in its briefing, these findings are consistent with Plaintiff's contemporaneous medical records showing normal range of motion and non-tender joints. Doc. 58 at 8. Dr. Balogun weighed all of this evidence before concluding Plaintiff was capable of performing sedentary work.

Finally, the Court addresses Plaintiff's argument that Defendant's decision on her second appeal was arbitrary and capricious. *Id.* at 48-51. In support of this argument, Plaintiff ostensibly contends she met her burden of providing evidence she was disabled within the meaning of the Policy and, therefore, the burden shifted to Defendant to establish she did <u>not</u> meet the disability test. *Id.* But Plaintiff bears the burden of showing an abuse of discretion here (*McNeal*, 998 F. Supp. 2d at 1042) and she has not met that burden. Defendant based its decision on: (1) Plaintiff's

medical records, examination notes, and statements from Plaintiff and her medical providers; (2) Nurse Cesar's review and interview of Plaintiff before the initial claim determination; (3) the review of two independent, board-certified occupational medicine physicians (Dr. Craven and Dr. Balogun); (4) a vocational review conducted by Ms. Hamilton and confirmed by Ms. Plummer; and (5) the findings associated with Plaintiff's SSDI decision. Plaintiff comes forward with no evidence suggesting that this decision was in error. The Court accordingly finds Defendant's decision was predicated on a reasonable basis.

For all of these reasons, the Court finds that Defendant's decision was not arbitrary and capricious and, rather, substantial evidence supported Defendant's decision to deny Plaintiff LTD benefits under the Any Occupation test. The Court therefore affirms Defendant's decision and, accordingly, grants Defendant's request for summary judgment on Plaintiff's claim for review.

### B.      Claim Under 29 U.S.C. § 1132(c)(1)(B)

The Court next turns to Plaintiff's claim for statutory penalties asserted in her purported amended complaint. Doc. 36. Plaintiff brings this claim pursuant to § 1132(c)(1)(B), which authorizes district courts, in their discretion, to impose a per diem penalty upon an "administrator" that "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary." 29 U.S.C. § 1132(c)(1)(B).

Unlike its review of Plaintiff's denial of benefits claim, the Court reviews Plaintiff's statutory penalty claim under the traditional summary judgment standard.[4] Pursuant to Rule 56, summary judgment is appropriate where the moving party demonstrates that "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." FED. R. CIV. P.

---

4       Accordingly, the Court construes those facts pertaining to its disposition of Plaintiff's § 1132(c)(1)(B) claim in the light most favorable to Plaintiff as the nonmoving party.

56(a). In applying this standard, courts must view the facts and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In its motion, Defendant argues Plaintiff's statutory penalty claim fails on both procedural and substantive grounds. First, Defendant contends this claim is procedurally improper because Plaintiff neither moved for leave to file her amended complaint asserting this claim nor obtained Defendant's consent before filing the amended complaint, as required by the Federal Rules. Doc. 45 at 33. Second, Defendant argues in the alternative that it cannot be held liable under § 1132(c)(1)(B) because it is not the "plan administrator" within the meaning of ERISA and thus had no legal duty to provide Plaintiff with the requested materials. *Id.* at 33-37.

Turning first to Defendant's procedural argument, the Court agrees that Plaintiff failed to comply with the Federal Rules in the submission of her amended complaint. Under Rule 15, once the time has lapsed for a party to amend its pleading as a matter of course (which neither party disputes is the case here), a party may amend only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(2). It is undisputed that Plaintiff neither obtained Defendant's consent nor sought leave from the Court before submitting her amended complaint. Plaintiff nonetheless argues the amended complaint "should be deemed filed" because: (1) it was erroneously filed without a motion seeking leave, (2) leave to amend should be freely granted,

(3) Defendant has not been prejudiced, and (4) Defendant should have sought to strike the complaint instead of answering. Doc. 50 at 51.

With respect to Plaintiff's first argument, the Court is skeptical of any characterization of Plaintiff's failure to seek leave as "erroneous." It is undisputed that Plaintiff was aware her submission was procedurally improper; indeed, counsel for Defendant notified Plaintiff of the impropriety of the amended complaint just four days after it was filed. Doc. 45-3 at 2. As to Plaintiff's second argument, although Plaintiff is correct that Rule 15(a)(2) dictates that the Court "should freely give leave when justice so requires," Plaintiff never asked the Court for leave. Instead, Plaintiff disregarded the applicable Rules and still offers no excuse for her failure to seek leave or to obtain consent from Defendant before filing the amended complaint. Plaintiff's declaration in her opposition brief that the amended complaint "should be deemed filed" is not tantamount to a request for leave to amend. The Court likewise disagrees that Defendant would not be prejudiced by allowing the amended complaint—which inserts an entirely new theory of relief into this case—to be "deemed filed." Finally, Plaintiff's last argument (that Defendant should have moved to strike the amended complaint rather than answer it) improperly attempts to shift the burden from Plaintiff to Defendant. The onus is upon Plaintiff to establish an entitlement to amendment; Plaintiff cannot simply file her amended pleading and force Defendant to explain why it is improper. For all of these reasons, because Plaintiff did not comply with the Rules in submitting the amended complaint, her claim under § 1132(c)(1)(B) is not properly before the Court.

Even if the Court were to consider this claim, however, it nonetheless fails from a substantive perspective.[5] The Tenth Circuit has recognized that § 1132(c)(1)(B) only permits an

---

[5]   The Court further notes that, had Plaintiff properly moved for leave to amend in accordance with Rule 15(a)(2), her motion for leave would have been subject to denial on the basis of futility. *See Minter v. Prime Equip. Co.*,

award of penalties against the <u>plan administrator</u>. *McKinsey v. Sentry Ins.*, 986 F.2d 401, 404-05 (10th Cir. 1993). Under ERISA, this is the "person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A); *see also McKinsey*, 986 F.2d at 404 ("Section 1002(16)(A) provides that if a plan specifically designates a plan administrator, then that individual or entity is <u>the</u> plan administrator for purposes of ERISA.").

Here, the Policy lists UPS—not Defendant—as "Plan Administrator." Indeed, Defendant explained to Plaintiff in its response to her document request that it was the "claim administrator," not the "plan administrator," and, further, that UPS held the plan administrator role. Because Defendant is not the plan administrator, it cannot be liable under § 1132(c)(1)(B). *See, e.g.*, *Averhart v. US WEST Mgmt. Pension Plan*, 46 F.3d 1480, 1489-90 (10th Cir. 1994) (holding that individual could not be liable for civil penalties under ERISA because he was not the plan administrator and statutory liability for failing to provide requested information lies only with the designated plan administrator); *Louderback v. Litton Indus., Inc.*, 504 F. Supp. 2d 1145, 1152 (D. Kan. 2007) (holding that group accident insurance plan insurer and independent claims administrator were not liable for statutory penalties for any violation of ERISA document disclosure requirements, because insurer and claims administrator were not plan administrators); *Ford v. Metro. Life Ins. Co.*, 834 F. Supp. 1272, 1281 (D. Kan. 1993) (where the plaintiff made her initial request for plan documents to the <u>claims</u> administrator, rather than the <u>plan</u> administrator, finding that the claims administrator was not the "administrator" of the plan as defined by ERISA and therefore could not be liable for penalties for failure to provide plan documents).

---

451 F.3d 1196, 1204 (10th Cir. 2006) (holding that the court considers a number of factors in deciding whether to allow an amendment, including timeliness, prejudice to the other party, bad faith, and futility of amendment).

Plaintiff attempts to dodge this issue by arguing that Defendant's conduct rendered it the "de facto" plan administrator or the "administrator in fact" and, as such, Defendant <u>can</u> be liable under § 1132(c)(1)(B). Doc. 50 at 52-54. However, as Defendant points out in its briefing, the "de facto" plan administrator theory has been rejected by the Tenth Circuit. *See, e.g.*, *McKinsey*, 986 F.2d at 404-05; *Talkin v. Deluxe Corp.*, 2007 WL 1469648, at *9 n.9 (D. Kan. 2007) ("The Tenth Circuit has refused to recognize liability under a de facto administrator theory. Thus, any claim plaintiff attempts to bring under a de facto theory is denied."); *Brende v. Reliance Standard Life Ins. Co.*, 2019 WL 2250142, at *7 (D. Kan. 2019) (noting that "[t]he Tenth Circuit has explicitly rejected [the plaintiff's] argument that the plan insurer/claims administrator should be liable under the statute because it served as the de facto administrator"). The Policy's designation of UPS as plan administrator is conclusive for purposes of applying § 1132(c)(1)(B) and cannot be expanded or modified to include Defendant, even if, as Plaintiff alleges, Defendant essentially acted as administrator. *See Averhart*, 46 F.3d at 1489-90. The law is clear that Plaintiff cannot pursue her statutory penalty claim against any entity other than the Policy's plan administrator and, because Defendant is not the plan administrator, the claim fails. Summary judgment is therefore appropriate on this basis.

## III. CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion to File Exhibits in Stanter (Doc. 53) is GRANTED.

THE COURT FURTHER ORDERS that Defendant's Motion for Summary Judgment (Doc. 44) is GRANTED.

IT IS SO ORDERED.

Dated: September 30, 2019                          /s/ *Holly L. Teeter*
                                                    HOLLY L. TEETER
                                                    UNITED STATES DISTRICT JUDGE